**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Martinsburg**

**UNITED STATES OF AMERICA**,

      Plaintiff,

v.                                            **Criminal No. 3:10-CR-13**

**ANDREW W. SEMAN**,

      Defendant.

**MEMORANDUM OPINION AND ORDER
ADOPTING IN PART AND DECLINING TO ADOPT IN PART
<u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>**

Pending before this Court is the Report and Recommendation to the District Judge Recommending that the District Court Grant, in Part, and Deny, in Part, Defendant's Motion to Suppress (Doc. 35), together with defendant's Objections to Magistrate Judge's Report and Recommendation (Doc. 38) and United States' Objection to Report and Recommendation that Defendant's Motion to Suppress be Granted as to the September 4, 2008 Traffic Stop (Doc. 40).

1.     Andrew W. Seman was indicted by the grand jury on March 17, 2010 (Doc. 1). The indictment charges the defendant with four offenses: (1) possession with intent to distribute 11.765 grams of heroin on September 4, 2008; (2) distribution of .23 grams of heroin on April 2, 2009; (3) possession with intent to distribute 3.625 grams of heroin on April 3, 2009; and (4) possession with intent to distribute 2.15 grams of heroin on October 27, 2009.

2. On April 30, 2010, defendant Seman filed a Motion to Suppress (Doc. 25), seeking suppression of all evidence obtained as a result of traffic stops on September 4, 2008, and October 27, 2009.

3. After a response from the Government (Doc. 30), the Magistrate Judge held an evidentiary hearing on the Motion on May 12, 2010.

4. On May 17, 2010, Magistrate Judge Joel issued his Report and Recommendation, recommending that the evidence obtained from the September 4, 2008, search be suppressed, but that the Motion to Suppress be denied with respect to the October 27, 2009, search (Doc. 35).

## SEPTEMBER 4, 2008 TRAFFIC STOP

5. In August and September, 2008, members of the Eastern Panhandle Drug and Violent Crimes Task Force were investigating the distribution of heroin by the defendant, Andrew Seman, aka "Snake."

6. On August 26, 2008, August 28, 2008, and September 2, 2008, Task Force officers utilized confidential informant Christina Saylor, (hereinafter "Saylor") to make controlled purchases of heroin from the defendant. After having made three controlled buys already from the defendant, the Task Force instructed Saylor to arrange another controlled buy on September 4, 2008.

7. On September 4, 2008, Saylor contacted Andrew Seman, who she knew as "Snake" to arrange the purchase of heroin. During the recorded phone call, the defendant told Saylor to meet him in the parking lot of the Inwood, West Virginia, McDonald's, in fifteen minutes. Task Force officers drove Saylor to the McDonald's parking lot, where she got out of the car and got into defendant's vehicle. Once in the vehicle, Saylor gave the

defendant $100.00 in recorded United States currency, provided to her by the Task Force, in exchange for four packets of heroin. This distribution is *not* charged in the Indictment because of issues that arose later with this confidential informant.[1]

8. Prior to the controlled buy, the Task Force arranged for uniformed West Virginia State Police officers to position themselves near the transaction site in order to stop defendant's vehicle once the transaction was complete. The Task Force did not wish to execute a "buy/bust" at the site of the controlled buy, because that would certainly alert the defendant that Saylor was in fact working with law enforcement. At that time, Saylor was still assisting in a number of investigations, and the Task Force did not wish to reveal her cooperation at that time.

9. Task Force officer Andy Evans of the West Virginia State Police testified at the suppression hearing that the Task Force often employs the assistance of uniformed officers to conduct a traffic stop on an individual who has just participated in a controlled transaction. "Normally there's a determination made prior to the transaction that it is going to be what we term as a buy bust. And if it is within the city limits, say for instance of Martinsburg, we normally would utilize uniformed members of the Martinsburg Police Department to effect the traffic stop. . . . Or in this case, the West Virginia State Troopers. We give them as much detail as we can about the location of the upcoming transaction, and try to have them in place somewhere out of sight but in the general vicinity where the transaction is going to occur." (Tr.11-12).[2]

---

[1] See Paragraph 33.

[2] References are to the transcript of the suppression hearing on May 12, 2010.

10. Furthermore, to protect the identity, and thus the safety, of the confidential informant and of any members of the Task Force that might be working in an undercover capacity with the confidential informant, Trooper Evans testified that the Task Force officers ask the uniformed officers "not to divulge [to the defendant] the fact that . . . there was a controlled purchase that took place." (Tr.12).

11. Trooper Clayton Ellwanger, also of the West Virginia State Police and a member of the Task Force, testified at the suppression hearing as well. Ellwanger testified that he too was working the September 4, 2008 controlled buy from the defendant and that his role in the investigation on that date was "[t]o provide surveillance and arrange uniformed units for a traffic stop." (Tr. 32). Ellwanger testified that uniformed Troopers were in the area and alerted to the Task Force's activity because the officers "were going to perform a traffic stop after the buy." (Tr. 34).

12. Trooper Evans testified that when Saylor returned from the buy, she told the officers that the defendant had the heroin "contained . . . within a cigar tube." (Tr. 10). Evans further testified that Saylor advised the defendant "took the cigar tube and emptied approximately ten packets containing heroin from inside the tube" and handed Saylor four of the ten packets. (Tr. 10). Thus, based on Saylor's after-buy statement, the Task Force believed defendant to be in possession of additional amounts of heroin.

13. Once the controlled buy was complete, the defendant drove east on Route 51 towards Inwood. (Tr. 35).

14. Trooper Ellwanger testified that once the controlled buy from defendant had concluded, Ellwanger "was given a vehicle description, and the route of travel of the suspect vehicle. Which in time [he] contacted Troopers and advised them of the same

4

where they could get in position for a traffic stop." (Tr. 34).

15. The uniformed Trooper with whom Ellwanger was in communication was Trooper Nicholas Campbell. When asked if he told Trooper Campbell why he should stop defendant's vehicle, Ellwanger testified, "We told . . . Trooper Campbell, he needed to find probable cause for the stop." (Tr. 35).

16. Trooper Evans testified at the suppression hearing that "Mr. Seman was operating a white . . .Sebring, with - - as best that I could recall, some type of front end damage. And to the best of my recollection, Mr. Compton, there was an, I believe, a gray fender on the passenger–front passenger side of the vehicle, and some other damage, from seeing the vehicle during the previous controlled purchases." (Tr. 19).

17. Trooper Campbell testified, "As soon as I [saw] the vehicle, I observed some damage to the front right portion of the vehicle." (Tr. 48). Trooper Campbell initiated a traffic stop on U.S. Route 11, just north of the intersection with Route 51. Trp. Campbell's report and attached narrative reflect that defendant's vehicle was a 2000 Chrysler Sebring with extensive front end damage and that said damage was the reason the Trooper stopped the car. When asked at the suppression hearing why he stopped the vehicle, Trooper Campbell testified that he "was checking safety of the vehicle under 17C-15-1, West Virginia State Code." (Tr. 48). Trooper Campbell went on to state that Section 17C-15-1 "provides us the authority to stop a vehicle at any time to check the safety of a vehicle. To be sure that this would pass West Virginia state inspection." (Tr. 48).

18. Trp. Campbell then asked Seman whether he had controlled substances in the vehicle, and noticed that Seman became "very nervous" and was stuttering during his answers. At this point Trp. Campbell asked for consent to search the vehicle, and Seman

gave permission. (Tr. 49).

19. Between the passenger seat and the front console, officers recovered four individually wrapped packets, containing .5 grams of heroin in each. (Tr. 49). Additionally, Trooper Campbell located a small cellophane bag containing approximately 13 grams of heroin, *outside the vehicle,* "directly outside the [passenger] window, which was down before the stop." (Tr. 50).

20. Finally, Trooper Campbell located a set of digital scales inside Seman's glove box and $300 in cash on his person. (Tr. 50).

21. The Task Force later discovered (when laboratory results began coming in from the buys in which Saylor had participated) that Saylor had been bringing fake heroin to the buys and substituting it for the heroin that she had purchased from various defendants on behalf of the Task Force, keeping it for herself. (Tr. 8).

22. Saylor worked approximately forty (40) controlled buys in all for the Task Force, and as a result of her actions, the Task Force threw out all of the buys and did not use as relevant conduct any buys conducted or reported by Saylor as to others. (Tr. 8-9).

## OCTOBER 27, 2009 TRAFFIC STOP

23. The October 27, 2009, traffic stop was effectuated by Patrolman Justin Harper of the Martinsburg City Police Department.

24. On that date, while conducting routine patrol, Patrolman Harper witnessed a white Honda Passport cross over the center line into the opposing line of traffic, causing an oncoming vehicle to veer into the parking area on the street to avoid collision. (Tr. 64).

25. The officer then activated his lights to initiate a traffic stop, but the vehicle did not immediately pull over. The vehicle continued an additional block and turned onto

another street. (Tr. 65).

26. The vehicle ultimately stopped in front of the entrance to the Martinsburg Optical Center. (Tr. 65).

27. When the patrolman approached the vehicle and began speaking with the defendant, he noted that the defendant's speech was slurred, he was blinking very slowly and talking very slowly. (Tr. 66).

28. Suspecting that the defendant was under the influence of something, the patrolman asked the defendant to step out of his vehicle so that a field sobriety test could be administered. (Tr. 66).

29. Before the test could be administered, Patrolman Harper was informed that the defendant was wanted on a warrant. As a result, the defendant was taken into custody. (Tr. 66-67).

30. A "pat down" search of the defendant's person was conducted, revealing over $4500 in cash. (Tr. 67).

31. Inasmuch as the defendant was the sole occupant of the vehicle, the vehicle was towed, and the officer conducted an inventory search of the vehicle.

32. The inventory search revealed what appeared to be marijuana residue on the floorboard, and a hypodermic needle and dirty spoon between the passenger seat and center console. (Tr. 71).

33. Patrolman Harper also found a bag of heroin in the street where the defendant's vehicle had turned. (Tr. 71-72).

34. Neither the hypodermic needle nor the dirty spoon was listed on the inventory of the vehicle search, but was contained in his incident report. (Tr. 81).

7

**DISCUSSION**

35. In his Report and Recommendation, the Magistrate Judge recommended that the fruits of the September 4, 2008, search be suppressed. The Magistrate Judge found the search to be invalid as an automobile safety stop under West Virginia Code § 17C-15-1, inasmuch as the Government presented no photographic evidence of the extent of the damage to the vehicle and presented very limited testimony concerning the damage. The Magistrate Judge also found there to be no probable cause emanating from the prior recorded drug deal, since it was later discovered that the Confidential Informant had switched the heroin for fake heroin.

36. With respect to the October 27, 2009, search, the Magistrate Judge found the search to be a valid inventory search of the vehicle.

37. It has long been established that "the 'touchstone of the Fourth Amendment is reasonableness.' Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." **Ohio v. Robinette**, 519 U.S. 33, 40 (1996) (*citing* **Florida v. Jimeno**, 500 U.S. 248, 250 (1991).

38. The courts have favored the totality of the circumstances test in recognition of the "'endless variations in the facts and circumstances' implicating the Fourth Amendment." **Robinette**, 519 U.S. at 39, *citing* **Florida v. Royer**, 460 U.S. 491, 506 (1983).

39. In **United States v. Hassan El**, 5 F.3d 726 (4th Cir. 1993), *cert. denied*, 114 S.Ct. 1374 (1994), the Fourth Circuit determined that as long as an officer has an objective right to stop a vehicle, regardless of the officer's subjective motivation or suspicion, the

resulting seizure of evidence of a more serious offense will not be suppressed on the ground that the stop was pretextual.

40. An objective test is employed to determine whether a traffic stop is constitutional. That is, "if an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment. That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity." *Id.,* 5 F.3d at 729-31.

41. "[P]robable cause is a fluid concept–turning on the assessment of probabilities in particular factual contexts–not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

42. Thus, "if a traffic stop is objectively justified . . . the officer's motive, whether pretextual or not, will not render the stop illegal." *Hassan El,* 5 F.3d at 729-31. *See also* *United States v. Jeffus*, 22 F.3d 554 (4th Cir. 1994).

43. "'[T]he fact that [an] officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.' ... Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Robinette*, 519 U.S. at 38-39, *citing* *Whren v. United States*, 517 U.S. 806, 813 (1996).

44. When the totality of the circumstances are examined in the case at hand, Trooper Campbell was fully aware that the defendant had just participated in a distribution of heroin. Task Force officers had made Trp. Campbell aware of the controlled buy before

it occurred and notified him once it was complete. Officers provided a description of the vehicle and its route of travel. Saylor observed an additional amount of heroin in defendant's possession beyond what she had purchased from Seman and advised the Task Force of such. Trooper Campbell clearly had probable cause to stop Seman's vehicle on this ground as well, even if such reason was not disclosed to defendant at the time of the stop.

45. In fact, an officer may stop and briefly detain a person for investigative purposes when there is "reasonable suspicion," based upon articulable facts, that criminal activity is afoot. ***United States v. Harris***, 39 F.3d 1262 (4th Cir. 1994).

46. The fact that the Task Force later discovered the malfeasance of Saylor in substituting fake heroin for heroin in no way affects the determination of probable cause or reasonable suspicion at the time of the search.

47. "Once a motor vehicle has been lawfully detained [even] for a traffic violation, the police may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." ***Robinette***, 519 U.S. at 38-39.

48. According to Trooper Campbell, after the defendant exited the vehicle, he consented to a search of the vehicle.

49. In addition, the search was justified under the exigent circumstances doctrine, which permits a warrantless search where probable cause exists and officers reasonably believe that contraband or other evidence may be destroyed or removed before a search warrant may be obtained. ***United States v. Collins***, 412 F.3d 515 (4th Cir. 2005).

50. In addition, the package containing the 13 grams of heroin located by Trooper Campbell on the ground immediately *outside* defendant's vehicle is not subject to suppression inasmuch as the defendant had no reasonable expectation of privacy in that place. See **Rakas v. Illinois**, 439 U.S. 128, 143 (1978).

51. With respect to the October 27, 2009, search, neither a warrant nor probable cause is required for a proper inventory search. **South Dakota v. Opperman**, 428 U.S. 364, 374-76 (1976).

52. "A proper inventory search is merely an incidental administrative step following arrest and preceding incarceration conducted to protect the arrestee from theft of his possessions, the police from false accusations of theft, and to remove dangerous items from the arrestee prior to his jailing." **United States v. Banks**, 482 F.3d 733, 739 (4th Cir. 2007).

53. In this case, the defendant was taken into custody pursuant to an outstanding warrant, there was no other driver available, the vehicle was blocking the entrance of a business, and the agency had a policy concerning inventory searches. Accordingly, the inventory search was proper.

54. The defendant argues that certain items seized, including a dirty spoon and hypodermic needle were not listed on the inventory sheet (although apparently listed on the officer's incident report). Given the purposes of the inventory search, this is not surprising. These items would not fall within the items to be protected from theft by the inventory search.

Based upon the foregoing, this Court finds that the Motion to Suppress (Doc. 25)

should be denied in its entirety. Accordingly, this Court **DENIES** the Motion to Suppress (Doc. 25), **ADOPTS IN PART AND DECLINES TO ADOPT IN PART** the Report and Recommendation to the District Judge Recommending that the District Court Grant, in Part, and Deny, in Part, Defendants Motion to Suppress (Doc. 35), **OVERRULES** defendant's Objections to Magistrate Judge's Report and Recommendation (Doc. 38), and **SUSTAINS** the United States' Objection to Report and Recommendation that Defendant's Motion to Suppress be Granted as to the September 4, 2008 Traffic Stop (Doc. 40).

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED:** June 10, 2010.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE